MITSUI O.S.K. LINES, LTD., Plaintiff,

v.

SEAMASTER LOGISTICS, INC.; Toll Global Forwarding (Americas) Inc.; American Global Logistics LLC; Kesco Container Line, Inc.; Kesco Shipping, Inc.; and Does 1 through 20, Defendants.

No. 11–2861 SC.

United States District Court, N.D. California.

May 10, 2012.

Conte C. Cicala, Flynn, Delich & Wise, San Francisco, CA, Erich Paul Wise, Flynn, Delich & Wise, Long Beach, CA, for Plaintiff.

Katharine Essick, Talcott Neal Bates, Eric Danoff, Emard Danoff Port Tamulski & Paetzold LLP, Kirk B. Freeman, Matthew Alan Mallet, Law Offices of Kirk B. Freeman, Michael John Tonsing, Tonsing Lawfirm, San Francisco, CA, Benjamin I. Fink, Berman Fink Van Horn P.C., Atlanta, GA, David Cohen, East Hampton, NY, for Defendants.

*ORDER DENYING MOTIONS TO PARTIALLY DISMISS SECOND AMENDED COMPLAINT*

SAMUEL CONTI, District Judge.

## I. *INTRODUCTION*

Now before the Court are two motions to partially dismiss the Second Amended Complaint, ECF No. 72 ("SAC"), of Plaintiff Mitsui O.S.K. Lines, Ltd. ("MOL"), a Japanese corporation. Specifically, the motions seek dismissal of the SAC's fourth and fifth claims, arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and 1962(d). The first motion to dismiss was brought by Defendants Seamaster Logistics, Inc. ("Seamaster") and Toll Global Forwarding (Americas) Inc., formerly named Summit Logistics International, Inc. ("Summit"), and the second was brought by Defendant American Global Logistics LLC ("AGL") (collectively, "Moving Defendants").

Both motions are fully briefed. ECF Nos. 77 ("SM/SL MTD"), 78–1 ("AGL MTD"), 80 ("MOL Opp'n"), 82 ("SM/SL Reply"), 84 ("AGL Reply"). Pursuant to Civil Local Rule 7–1(b), both motions are suitable for decision without oral argument. For the reasons set forth below, the Court DENIES both motions.

## II. *BACKGROUND*

The Court assumes familiarity with Magistrate Judge James's October 19, 2011, 2011 WL 4974476, Order dismissing MOL's original Complaint. ECF No. 38. Therefore, the Court will only briefly summarize the case, supplementing Judge James's account with allegations contained in the SAC. The Court recounts additional, specific allegations as part of the discussion sections below, and takes all of the SAC's well-pleaded allegations as true. *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

MOL is a Vessel Operating Common Carrier ("VOCC")—that is, an ocean shipper—operating between foreign and U.S. ports, including the Port of Oakland. Moving Defendants are, in industry parlance, "NVOCCs," that is, Non–Vessel Operating Common Carriers. Like MOL, they are shippers, but unlike MOL, they do not operate seafaring vessels. NVOCCs such as the Moving Defendants essentially are trucking companies that en-

gage only in inland or "door" carriage, while VOCCs like MOL may engage in ocean shipping. *See* SAC ¶ 16.

Sometimes, in addition to providing ocean carriage, MOL is hired to arrange inland carriage. *See id.* On those jobs, called "through" or "door-to-door" carriage, MOL pays NVOCCs to arrange for the inland leg (or legs) of the trip on MOL's behalf. *Id.* MOL alleges that Defendants engaged in a scheme to charge MOL for unnecessary or nonexistent inland carriage. In essence, MOL alleges that Defendants routinely represented to MOL that they had performed inland carriage to or from a port serviced by MOL, but in actuality third parties would make the inland shipments. As a result, MOL allegedly was induced into paying for inland carriage that it never received. *See id.* ¶¶ 24–31. MOL alleges that some of this conduct occurred in inland China and some in the United States. *See* MOL Opp'n at 7–8 (identifying allegations of SAC which purportedly pertain to U.S. conduct).

The SAC's fourth and fifth claims assert that, by using postal mail, faxes, and the Internet to communicate with and bill MOL in connection with these shipments, Defendants engaged in wire and mail fraud—predicate acts that can support civil RICO liability under 18 U.S.C. §§ 1962(c) and (d), respectively.[1] *See* SAC ¶¶ 78–91. Moving Defendants' position, in brief, is that MOL cannot state viable RICO claims against them because the case primarily concerns conduct that took place in inland China and effected MOL in Japan, and that, under *Morrison v. National Australia Bank Ltd.,* — U.S. —,

130 S.Ct. 2869, 177 L.Ed.2d 535 (2010), RICO has no extraterritorial application.

### III. *LEGAL STANDARD*

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1988). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937. However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The allegations made in a complaint must be both "sufficiently detailed to give fair notice to the opposing party of the nature of the claim so that the party may effectively defend against it" and "sufficiently plausible" such that "it is not unfair to require the opposing party to be subjected to the expense of discovery." *Starr v. Baca,* 633 F.3d 1191, 1204 (9th Cir.2011).

### IV. *DISCUSSION*

#### A. **Morrison** *and Its Progeny*

Moving Defendants have not challenged the sufficiency of MOL's factual allega-

---

**1.** Section 1962(c) provides: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enter-

prise's affairs through a pattern of racketeering activity or collection of unlawful debt." Section 1962(d) makes it unlawful to conspire to do so. Section 1961(1) enumerates prohibited racketeering activities (or "predicate acts"), which include mail and wire fraud.

tions. *See* SM/SL Reply at 7–8 (acknowledging that MOL's claims are sufficiently pled). Instead, Moving Defendants rest their challenge to MOL's RICO claims on *Morrison*, a securities action, and the handful of cases that have applied its reasoning in the RICO context. Because the post-*Morrison* RICO cases have yet to settle on a single approach, the Court will briefly survey the field. It concludes that *European Community v. RJR Nabisco, Inc.*, No. 02–CV–5771 (NGG)(VVP), 2011 WL 843957 (E.D.N.Y. Mar. 8, 2011), supplies the governing rule in this case.

### 1. Territoriality in the Securities Context

In *Morrison*, the Supreme Court considered whether § 10(b) of the Securities and Exchange Act of 1934 has extraterritorial application. 130 S.Ct. at 2876–77. The *Morrison* plaintiffs, all Australian nationals, had purchased stock in an Australian bank on an Australian stock exchange. Their complaint alleged that officers of the bank's U.S. subsidiary had, in the United States, made fraudulent statements that caused some of the subsidiary's assets to appear more valuable than they really were. *Id.* at 2876. On these facts, the Court addressed the question of whether the Australian plaintiffs had a viable cause of action under § 10(b), given the long-standing presumption against extraterritorial application of domestic laws. *Id.* at 2877–78.

The court held that they did not. Rejecting tests that various circuit courts had developed for ascertaining the extraterritorial application of statutes, *id.* at 2878–81, the court articulated the presumption against extraterritoriality in robust terms: "When a statute gives no clear indication

of an extraterritorial application, it has none." *Id.* at 2878. The court then turned to the language of the Exchange Act, observing that "the objects of the statute's solicitude" were "transactions in securities listed on domestic exchanges, and domestic transactions in other securities . . . ." *Id.* at 2884. "It is those transactions that the statute seeks to regulate . . .; it is parties or prospective parties to those transactions that the statute seeks to protect . . . ." *Id.* (citations omitted). On that basis, the court concluded that Congress did not intend for the Exchange Act to possess extraterritorial reach.

The *Morrison* court also rejected the argument that the case called only for *domestic* application of § 10(b). The court acknowledged that plaintiffs had alleged some U.S. conduct, but this did not make their proposed application of § 10(b) domestic rather than extraterritorial: "[I]t is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Id.* (emphasis in original).

### 2. Cases Addressing Territoriality in the RICO Context

■ Since *Morrison* made it clear that the presumption against extraterritoriality is a canon of construction applicable to any statute, *id.* at 2878–79, a half-dozen courts have applied its reasoning in the RICO context.[2] These courts have uniformly held that RICO is silent as to its extraterritorial application and that, under *Morrison*, it therefore has none. *See, e.g., In re*

---

**2.** *Cedeño v. Intech Group, Inc.*, 733 F.Supp.2d 471, 474 (S.D.N.Y.2010); *Norex Petroleum Ltd. v. Access Industries, Inc.*, 631 F.3d 29, 32 (2d Cir.2010); *European Cmty.*, 2011 WL 843957; *United States v. Philip Morris USA,*

*Inc.*, 783 F.Supp.2d 23, 28–29 (D.D.C.2011); *In re Toyota Motor Corp.*, 785 F.Supp.2d 883, 913 (C.D.Cal.2011); *CGC Holding Co., LLC v. Hutchens*, 824 F.Supp.2d 1193, 1209–10 (D.Colo.2011).

*Toyota*, 785 F.Supp.2d at 913; *Norex*, 631 F.3d at 32. Further, these courts have broadly agreed that, while the "object" of the Exchange Act's "solicitude" considered in *Morrison* was domestic securities transactions, in the RICO context "it is the 'enterprise' that is the object of the statute's solicitude, and the 'focus' of the statute." *European Cmty.*, 2011 WL 843957, at *5. Specifically, "the focus of RICO is on the enterprise as the recipient of, or cover for, a pattern of criminal activity." *Cedeño*, 733 F.Supp.2d at 474. RICO "seeks to regulate 'enterprises' by protecting them from being victimized by or conducted through racketeering activity." *European Cmty.*, 2011 WL 843957, at *5.[3]

Beyond these points, however, the cases' reasoning diverges. *Cf. In re Toyota*, 785 F.Supp.2d at 914–15 (surveying cases and observing that "[i]t is unclear how *Morrison*'s logic, which evaluates the 'focus' of the relevant statute, precisely translates to RICO"). This divergence has been obscured to a certain degree by factual differences between the cases, specifically,

their varying mixtures of foreign and domestic elements. Some cases have been relatively clear-cut: Post-*Morrison* courts have had no difficulty concluding that far-flung foreign schemes conducted by foreign actors and implicating only incidental U.S. conduct are fundamentally extraterritorial and thus beyond the reach of RICO.[4] But in other cases, the balance of foreign and domestic elements has not been so one-sided. In those cases, district courts—starting from the premise that RICO has no extraterritorial application—have had to decide whether applying RICO to the facts before them would result in an impermissible extraterritorial application or a permissible domestic one. in *Morrison*'s memorable terms, these courts much or what kind of domestic conduct sends its kennel. *Morrison* does not say, and the approaches.[5]

The challenge of applying *Morrison* in RICO cases stems from the difficulty of ascertaining where a RICO enterprise is located. This difficulty was not present in the securities context from which *Mor*-

---

3. *See also Philip Morris*, 783 F.Supp.2d at 28–29 (citing *Cedeño*, 733 F.Supp.2d at 473) (RICO "is focused on how a pattern of racketeering activity affects an enterprise"); *In re Toyota*, 785 F.Supp.2d at 914 (same); *but see CGC Holding Co.*, 824 F.Supp.2d at 1209–10 ("The focus of [RICO] is the racketeering activity, i.e., to render unlawful a pattern of domestic racketeering activity perpetrated by an enterprise.").

4. *See Cedeño*, 733 F.Supp.2d 471 (Venezuelan actors allegedly conspired to imprison Venezuelan national in Venezuela); *Norex*, 631 F.3d 29 (conspiracy by Russian nationals to seize control over Russian oil industry through widespread bribery and institutional corruption in Russia); *European Cmty.*, 2011 WL 843957 (South American and Russian cartels allegedly operated labyrinthine international money laundering and smuggling scheme involving illicit distribution abroad of U.S.-made cigarettes).

5. *See Philip Morris*, 783 F.Supp.2d 23 (where English cigarette manufacturer allegedly con-

spired to deceive American public about health effects of smoking, district court dismissed RICO claims, despite enterprise's "tremendous impacts" on United States, because English defendant's domestic conduct was "isolated" and not by itself actionable under RICO); *In re Toyota*, 785 F.Supp.2d at 914–15 (dismissing RICO claims as insufficiently pled but observing that well-pled allegations of "enterprise operating in the United States, consisting largely of domestic 'persons,' engaging in a pattern of racketeering activity in the United States, and damaging Plaintiffs abroad, … might well state a claim consistent with *Morrison's* holding"); *CGC Holding Co.*, 824 F.Supp.2d at 1209–10 (where Canadian nationals allegedly engaged in an enterprise "to extract money from [U.S. plaintiffs] through a phony loan scheme," plaintiffs stated cognizable RICO claim because "the racketeering activity of the enterprise … was directed at and largely occurred within the United States").

*rison* arose. When the *Morrison* court determined that only "transactions in securities listed on domestic exchanges, and domestic transactions in other securities" were properly subject to the Exchange Act, 130 S.Ct. at 2884, it could rely on courts to identify the place where an alleged transaction occurred: Though securities transactions may occur in volume, each one occurs in a readily ascertained place at a readily ascertained time.

■ RICO enterprises are different. They are not discrete events; they are groups of people.[6] As such, they do not "occur" in a place in the way that transactions do. They have an entirely different and, especially in the case of association-in-fact enterprises, more amorphous structure:

> [A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods-by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies.

*Boyle v. United States,* 556 U.S. 938, 948, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009). An association-in-fact enterprise need only have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946, 129 S.Ct. 2237.

■ Because the very notion of an association-in-fact enterprise is "expansive," *id.* at 944, 129 S.Ct. 2237, some alleged enterprises may be difficult to pin to a location. Nevertheless, because RICO applies only to domestic enterprises, courts will be called upon to determine whether a particular RICO enterprise, whatever its structure, is extraterritorial or domestic, which implies a rough determination of the location of the enterprise. The enterprise's location need not be targeted with pinpoint accuracy: The relevant question is simply whether the enterprise is extraterritorial or not.[7]

---

6. RICO defines the term "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The latter type of enterprise—the kind that is not a legal entity—is commonly called an "association-in-fact" or "associated-in-fact" enterprise. *E.g., Cedeño,* 733 F.Supp.2d at 472; *In re Toyota,* 785 F.Supp.2d at 900.

7. The location of the associated racketeering activity is a different question, and not dispositive of the issue of the enterprise's territoriality. "The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). "RICO is not a recidivist statute designed to punish someone for committing a pattern of multiple criminal acts. Rather, it prohibits the use of such a pattern to impact an enterprise ...." *Cedeño,* 733 F.Supp.2d at 473. Accordingly, the question before this Court is not where the predicate acts alleged by MOL took place, but rather the territoriality of the alleged enterprise itself. *See id.* at 474; *European Cmty.,* 2011 WL 843957, at *5. The propriety of focusing the territoriality inquiry on the enterprise rather than the racketeering is confirmed by the fact that RICO defines the term "enterprise" to include legal entities. 18 U.S.C. § 1961(4). In such cases, the territoriality of the RICO enterprise clearly would not depend on the location where predicate acts occurred but on the location of the legal entity, that is, of the enterprise itself. The Court sees no reason why the analysis should differ for association-in-fact enterprises.

### 3. The Nerve Center Test

The only case to squarely propose a principled way to determine the territoriality of a RICO enterprise is *European Community*. The *European Community* court recognized that "[b]ecause the 'focus' of RICO is the 'enterprise,' a RICO 'enterprise' must be a 'domestic enterprise.'" 2011 WL 843957, at *6 (citing *Morrison*, 130 S.Ct. at 2884). The court acknowledged the lack of precedent "suggesting how a court may determine the geographic location of a RICO enterprise." *Id.* It then analogized the inquiry to "determin[ing] the geographic location of a corporation." *Id.* The court turned for guidance to *Hertz Corp. v. Friend*, 559 U.S. 77, 130 S.Ct. 1181, 175 L.Ed.2d 1029 (2010). In that case, the Supreme Court set forth a "nerve center" test for ascertaining the state citizenship of a corporation for purposes of diversity jurisdiction. *Hertz*, 130 S.Ct. at 1192–94. The *European Community* court, applying *Hertz* principles, suggested that courts should focus on the RICO enterprise's "brains" as opposed to its "brawn," that is, on "the decisions effectuating the relationships and common interest of its members, and how those decisions are made," as compared to the location where the consequences of those decisions transpire. 2011 WL 843957, at *6. The court appeared to recognize that the inquiry will sometimes yield artificially simplified results, "i.e., [a] single place of business for a corporation, though there may be many," but stated that "the test is still instructive . . . ." *Id.*

■ This Court agrees. The nerve center test provides a familiar, consistent, and administrable method for determining the territoriality of RICO enterprises in cases such as the one at bar, which blend domestic and foreign elements. It permits district courts deciding RICO cases like this one to analogize to the larger body of cases that use the nerve center test to identify a corporation's state court citizenship for diversity purposes. Further, the nerve center test has the virtue of recognizing that a RICO enterprise is analytically distinct from the pattern of predicate acts associated with it—a distinction that the earlier cases have sometimes blurred. *E.g.*, *CGC Holding Co.*, 824 F.Supp.2d at 1209–10 (determining that RICO enterprise was domestic because the "racketeering activity of the enterprise . . . was directed at and largely occurred within the United States"). In short, the test aligns the focus of the court's inquiry with the focus of RICO: "the enterprise as the recipient of, or cover for, a pattern of criminal activity." *Cedeño*, 733 F.Supp.2d at 474. To the extent that previous post-*Morrison* RICO cases—none of which are binding precedent on this Court—have focused on the nationality of a RICO enterprise's constituent members, the location of racketeering activity, the location of "effects," or the location or quantity of ambiguously defined "conduct," this Court parts ways with them.

### B. *Application of Nerve Center Test*

The nerve center test ascertains the territoriality of an association-in-fact RICO enterprise by examining the alleged "decisions effectuating the relationships and common interest of [the enterprise's] members, and how those decisions are made." *European Cmty.*, 2011 WL 843957, at *6. This requires the Court first to examine the structure of the enterprise alleged by MOL.

### 1. Structure of the Alleged RICO Enterprise

"To state a claim under § 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir.2007) (internal quotation marks omitted).[8] Pres-

---

8. MOL also asserts a claim under subsection (d) of § 1962. Subsection (d) simply makes it

ently, this Court is concerned only with the second element, that of the enterprise. Moving Defendants have not challenged the sufficiency of MOL's allegations of the "enterprise" element. Nevertheless, because MOL's pleading could be clearer in connecting its allegations to its claims, the Court recounts the allegations that comprise the enterprise element. The Court does so solely to illuminate the structure of the alleged enterprise, with an eye toward applying the nerve center test.

■ "[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Boyle*, 556 U.S. at 948, 129 S.Ct. 2237. To plead the "enterprise" element of a RICO claim, plaintiffs must adequately allege that: (1) defendants have associated for a common purpose for engaging in a course of conduct, (2) in an ongoing organization, either formal or informal, and (3) the various associates function as a continuing unit. *See Odom*, 486 F.3d at 552–53.[9]

■ The enterprise alleged by MOL satisfies these minimal structural requirements—which, as the Ninth Circuit has observed, are "not very demanding." *Id.* at 548. MOL alleges the following: Seamaster is a California corporation, Summit is a U.S. corporation with its principal place of business in New Jersey, and AGL is a "corporation and/or limited liability company" organized under Georgia law,

with its principal place of business in that state. SAC ¶¶ 4–5, 10. Both Summit and Seamaster are part of a group of companies whose corporate parent is the Toll Group ("Toll"), a business entity of form unknown. *Id.* ¶ 6 & n. 1.[10] During a period covering 2006–2007, Summit and Seamaster were spun off from a corporate forebearer, the Hecny Group ("Hecny"), with whom Summit and Seamaster now directly compete. *Id.* ¶ 7. Jerry Huang, aka Huang Chun Jen ("Huang"), was a "key executive and member of the Board of Directors" of Hecny, *id.*, and now is Summit's Managing Director for the Asia Pacific Region, *id.* ¶ 8.

Hecny was the "longtime strategic partner" of a company called Global Link Logistics, Inc. ("Global Link"), whose founder and CEO was Chad Rosenberg ("Rosenberg"). *Id.* ¶ 12. Rosenberg left Global Link and bought Moving Defendant AGL; Rosenberg now serves as AGL's CEO. *Id.* ¶¶ 11–12, 14; Ex. I.

MOL alleges that the relationship between AGL on the one hand and Summit and Seamaster on the other is a "strategic partnership" mirroring that of Hecny and Global Link. *Id.* ¶ 15. Furthermore, MOL avers that Summit/Seamaster and AGL comprise an association-in-fact. *Id.* "Through Seamaster, AGL ships goods with MOL on behalf of customers in the United States who are the ultimate recipi-

unlawful to conspire to violate the preceding three subsections. Since Moving Defendants' § 1962(d) liability depends on MOL making out a viable claim under § 1962(c), and Moving Defendants have raised no specific challenge to the conspiracy element of MOL's § 1962(d) claim, the Court focuses on § 1962(c) exclusively.

9. *Odom* was decided before *Boyle*, but the Court sees no distinction between the cases' respective definitions of a RICO enterprise. Both cases simply applied the holding of *Turkette* to reject argument that RICO re-

quired a plaintiff to show that an enterprise has a separate or "ascertainable" structure, i.e., one going beyond what is necessary to carry out its racketeering activities. *Compare Odom*, 486 F.3d at 553 *with Boyle*, 556 U.S. at 948, 129 S.Ct. 2237. The Court therefore continues to recognize *Odom* as binding authority.

10. As explained *supra* in the Introduction, Summit is Toll's former name and Toll appears in this action as Toll Global Forwarding (Americas) Inc.

ent of the goods." *Id.* The purpose of the relationship is "to facilitate the import transportation of cargo (largely furniture and other consumer goods) from Asia to the United States." *Id.* MOL alleges that Summit, Seamaster, and AGL "actively conducted and participated in the affairs of the enterprise" by "arranging for and otherwise participating in thousands of shipments of cargo from Asia to the United States." *Id.* ¶ 80. MOL alleges that the partnership and related shipping activities began at least in 2007 and continued until at least 2011. *Id.* ¶ 79.

Taken together, these allegations describe an association-in-fact enterprise, that is, "a continuing unit that functions with a common purpose" without being, itself, a legal entity. *Boyle,* 556 U.S. at 948, 129 S.Ct. 2237; 18 U.S.C. § 1961(4). MOL alleges a common purpose, namely, the import transportation of cargo from Asia to the United States. MOL further alleges an ongoing organization. An ongoing organization is nothing more than "a vehicle for the commission of two or more predicate crimes" which need not have any particular formal organization. *See Odom,* 486 F.3d at 552. MOL alleges that Seamaster/Summit and AGL form a strategic partnership which engages in the allegedly wrongful shipping practices described in the SAC, practices which are furthered by the alleged mail and wire frauds. While MOL does not allege that the partners are bound by any formal agreement or structure, they are not required to do so. *See id.* Further, the presence of Huang and Rosenberg in both the previous Hecny/Global Link partnership and the current alleged partnership between Seamaster, Summit, and AGL supports a reasonable inference that these corporations serve, at least to a significant degree, to effectuate the purposes of an informal alliance of businesspeople. Lastly, MOL's allegations describe an enterprise that satisfies the continuity require-

ment. This requirement "focuses on whether the associates' behavior was 'ongoing' rather than isolated activity." *Odom,* 486 F.3d at 553 (quoting *United States v. Patrick,* 248 F.3d 11, 19 (1st Cir.2001)). MOL's allegation that the partnership, as well as the shipping activities at the center of this case, were ongoing at least from 2007 to 2011 easily satisfies this standard.

## 2. Territoriality of the Alleged RICO Enterprise

Having described the alleged RICO enterprise, the Court now applies the nerve center test to determine whether RICO applies to it. This test examines the "decisions effectuating the relationships and common interest of [the enterprise's] members, and how those decisions are made." *European Cmty.,* 2011 WL 843957, at \*6. Focusing on the brains rather than the brawns of the enterprise, *id.,* the Court concludes that the enterprise alleged here is a domestic one.

The Court first observes that all three Moving Defendants are U.S. corporations. Their domestic legal status is not by itself dispositive. *See supra* pp. 940–41 (rejecting notion that "nationality of a RICO enterprise's constituent members" determines territoriality). Their domestic status tends to show, however, that the decision making necessary to effectuate the alleged association-in-fact enterprise's common purpose occurred substantially within the territory of the United States.

Additionally, MOL alleges that Seamaster, Summit, and AGL "arranged" shipments in the United States. The location where the shipping actually took place is merely evidence of where the enterprise exercised its "brawn." It is the activity of arranging the allegedly illicit shipments that indicates where the enterprise exercised its "brains." MOL alleges that these

shipments were arranged in substantial part within the United States, which, in combination with the U.S. status of the alleged enterprise's member corporations, supports a reasonable inference in MOL's favor, i.e., that the enterprise's nerve center was domestic.

Even if the Court were to read the allegations of the complaint in a light less favorable to MOL—and in the procedural posture of this case, the Court must do the opposite—MOL has alleged, at minimum, an enterprise with one foot in China and one in the United States. This is more than the merely incidental domestic activity which, *Morrison* warned, would do nothing to shake the watchdog from its post. *See Morrison*, 130 S.Ct. at 2884. On the contrary, MOL alleges a cross-national enterprise that uses U.S. corporations as cover for a pattern of racketeering activities. These allegations are enough to assert the existence of a domestic enterprise to whose activities RICO applies. *See Cedeño*, 733 F.Supp.2d at 474.

Moving Defendants' arguments to the contrary are unavailing. Apparently following the "conduct" approach that some earlier cases took, but which this Court has declined to follow, *see supra* Section IV.A.3, AGL characterizes this case as being "primarily" or "at its core" about conduct in inland China. AGL MTD at 2, AGL Reply at 4. AGL argues, in essence, that because the bulk of the allegations in the SAC relate to conduct in China, the alleged RICO enterprise must be extraterritorial. As MOL points out, AGL essentially ignores MOL's allegations of U.S. conduct. But even if AGL had accurately characterized MOL's allegations, the location of "conduct" is simply not the test. The location of the enterprise is. AGL's position would supplant the relatively principled nerve center test with one that invites courts to adopt a "know-it-when-they-see-it" approach to territoriality, with pre-dictably unpredictable results. This Court declines to adopt that approach.

For their part, Seamaster and Summit urge the Court to dismiss MOL's RICO claims because MOL alleges "an international, not domestic, RICO enterprise." SM/SL Reply at 4. This argument misapprehends the holding of *Morrison*. That case teaches that *"some* domestic activity" will not save an otherwise extraterritorial RICO claim—not that *any* international activity will doom an otherwise domestic claim. *See Morrison*, 130 S.Ct. at 2884 (emphasis in original). Essentially, Seamaster and Summit argue that even though MOL alleges an enterprise with domestic ties substantial enough to make it at least "international," such an enterprise is not truly domestic because the extraterritorial elements somehow matter more. Adopting this position would require the Court to engage in the sort of conduct-weighing analysis that it has already declined to undertake. When a RICO plaintiff alleges a combination of domestic and foreign elements (e.g., conduct, effects, actors), a court needs some way to determine whether the domestic elements outweigh the foreign for purposes of the territoriality inquiry. This implies a determination about which elements are relatively important. Such a determination could be made on an ad hoc basis after examining the (often prolix and complex) allegations of the RICO complaint. But this Court believes that the analysis calls instead for a consistent method that cuts through extraneous matter to the heart of the issue. The nerve center test meets this need. In the RICO context, as well as in the corporate citizenship context from which it is derived, the nerve center test takes a sprawling network of decision makers and actors and reduces it, for legal purposes, to a single, simplified location. This simplification is a feature, not a bug. Seamaster and Summit's position would unhelpfully

muddy the analysis: Whereas the relevant categories under *Morrison* are "extraterritorial" and "not," Seamaster and Summit would add a third category—"both." In such situations, courts would be stuck making ad hoc determinations about territoriality without a reliable guide.

The Court also rejects Seamaster and Summit's argument that MOL's RICO claims are impermissibly extraterritorial because MOL, as a Japanese company, feels the effects of the alleged scheme in Asia. SM/SL Reply at 4. *Morrison* repudiated the "effects" tests adopted by various circuits and replaced it with one that focuses, in the securities context, on the location of the alleged transaction, and, in the RICO context, on the location of RICO's object of solicitude, the enterprise as a cover for or victim of racketeering activity. *Cedeño*, 733 F.Supp.2d at 474. *Morrison's* holding bars courts from refusing to apply RICO simply because the scheme's effects are felt abroad; it does not suggest that courts may *deny* relief for that reason. It is true that "MOL unambiguously seeks application of RICO to remedy harmful effects felt outside the United States." SM/SL Reply at 4. Such application is entirely permissible under *Morrison*, because the enterprise causing those foreign effects is a domestic one.

## V.  *CONCLUSION*

Moving Defendants have not challenged MOL's RICO claims on any grounds other than the presumption against extraterritoriality. Having concluded for the foregoing reasons that this challenge does not succeed, the Court accordingly DENIES the partial motions to dismiss brought, respectively, by Defendants Seamaster Logistics, Inc., and Toll Global Forwarding (Americas) Inc., formerly named Summit Logistics International, Inc., and by American Global Logistics LLC. Plaintiff Mitsui O.S.K. Lines, Ltd.'s RICO claims remain

undisturbed, as do the other, unchallenged claims of the Second Amended Complaint.

IT IS SO ORDERED.