**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>CHAO FAN XU,<br>*Defendant-Appellant*. | No. 09-10189<br><br>D.C. No.<br>2:02-CR-00674-<br>PMP-LRL-1 |

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>YING YI YU,<br>*Defendant-Appellant*. | No. 09-10193<br><br>D.C. No.<br>2:02-CR-00674-<br>PMP-LRL-4 |

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>GUO JUN XU,<br>*Defendant-Appellant*. | No. 09-10201<br><br>D.C. No.<br>2:02-CR-00674-<br>PMP-LRL-2 |

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee*,

          v.

WAN FANG KUANG,
          *Defendant-Appellant*.

No. 09-10202

D.C. No.
2:02-CR-00674-
PMP-LRL-3

OPINION

Appeal from the United States District Court
for the District of Nevada
Philip M. Pro, District Judge, Presiding

Argued and Submitted
April 17, 2012—San Francisco, California

Filed January 3, 2013

Before: Alfred T. Goodwin, Stephen Reinhardt,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Goodwin

# SUMMARY[*]

## Criminal Law

The panel affirmed the convictions and vacated the sentences of four Chinese nationals who participated in a scheme to steal funds from the Bank of China and to escape prosecution and retain the proceeds by illegal transfers of funds and by immigration fraud.

The panel held that the defendants' RICO conspiracy convictions are not the result of an improper extraterritorial application of 18 U.S.C. § 1962(d) because the defendants' criminal enterprise involved both bank fraud and immigration fraud centered on stealing money from the Bank of China and traveling freely with the stolen money in the United States.

Explaining that conspiracy does not require completion of the substantive crime, the panel held that there was sufficient evidence to support the defendants' money laundering conspiracy convictions under 18 U.S.C. § 1956(h), and that 18 U.S.C. § 1957(d)'s jurisdictional requirement is met because the transactions took place in the United States. The panel likewise held that there was sufficient evidence to support the defendants' convictions for conspiracy to transport stolen money under 18 U.S.C. § 2314.

The panel held that the district court did not plainly err in its treatment of videotaped testimony at trial, that the defendants' Confrontation Clause rights were not violated,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

and that the district court did not abuse its discretion in limiting the testimony of the defendants' expert witnesses.

The panel rejected as meritless the defendants' jury instruction challenges related to burden shifting, Chinese law, fatal variance/constructive amendment, theory of defense, aiding and abetting, the definition of "on or about," and the incomprehensibility of the numerous Chinese names presented to the jury.

The panel held that the district court did not violate the *Ex Post Facto* Clause by applying the 2007 Sentencing Guidelines to a conspiracy that did not end until the defendants' 2004 arrest.

The panel remanded for resentencing under U.S.S.G. § 2S1.1(a)(2) because the district court improperly relied on the defendants' foreign conduct to meet the requirements of U.S.S.G. § 2S1.1(a)(1)(A). The panel rejected as meritless an objection to an abuse of trust enhancement under U.S.S.G. § 3B1.3, and deemed waived an objection to an enhancement for relocation to avoid law enforcement under U.S.S.G. § 2B1.1(b)(9)(A).

Because the district court did not provide sufficient grounds to support the $482 million restitution order, the panel remanded for reconsideration regarding its legal and factual basis.

**COUNSEL**

Mario D. Valencia, Henderson, Nevada, for Defendant-Appellant Chao Fan Xu; Marc Picker, Reno Nevada, for Defendant-Appellant Guo Jun Xu; Loren Graham, Stateline, Nevada, for Defendant-Appellant Ying Yi Yu; Chad A. Bowers, Las Vegas, Nevada, for Defendant-Appellant Wan Fang Kuang.

Krista Tongring, United States Department of Justice, Organized Crime and Gang Section, Washington, D.C.; Ronald L. Cheng, United States Department of Justice, Organized Crime and Gang Section, Los Angeles, California, for Plaintiff-Appellee.

**OPINION**

GOODWIN, Circuit Judge:

Four Chinese nationals appeal their convictions and sentences for federal crimes that they committed as part of a scheme to steal funds from the Bank of China, where two of the defendants were high-level employees, and to escape prosecution and retain the proceeds by illegal transfers of funds and by immigration fraud. We affirm the convictions, and vacate the sentences and remand for resentencing.

Defendants Xu Chaofan ("Chaofan"), Xu Guojun ("Guojun"), Yu Ying Yi ("Yingyi"), and Kuang Wan Fang

("Wanfang")[1] (collectively, "Defendants"), challenge the application of the Racketeer Influenced and Corrupt Organizations Act ("RICO") to extraterritorial conduct which occurred in China, as well as various rulings on evidence and defense motions. They also challenge their sentences.

The scheme involved diverting bank funds from the Bank of China to a holding company in Hong Kong. Defendants were charged with manipulating auditing controls to conceal their diversion of bank funds, and using the funds to speculate in foreign currency, to make fraudulent loans, to purchase real estate in Asia and North America, and to finance gambling trips to Las Vegas and other casino venues. As an essential part of the scheme, each of the Defendants entered into a fraudulent marriage with a spouse who held valid United States immigration status. After the Bank of China discovered their scheme, Defendants fled to the United States using their falsified immigration documents. Defendants were arrested and brought to trial in the United States District Court for the District of Nevada.

We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## I.  Facts and Procedural Background

Guojun and Yingyi were legally married in China in 1985. Chaofan and Wanfang were legally married in China in 1992. Chaofan was employed by the Bank of China from 1982 through 2001. The Bank of China is a state-owned

---

[1] Chinese custom puts a person's surname first and given name last. We refer to Defendants by their first name to avoid confusion with certain witnesses who share a surname with a defendant.

bank that is headquartered in Beijing.  It operates throughout China through a series of provincial branches, second-level branches, and sub-branches.  In 1992, Chaofan was promoted to president/general manager of the Kaiping sub-branch in Guangdong province, and he served in that position until August 1998.  Guojun was hired in 1994 as head of accounting at the Kaiping sub-branch.  In August 1998, Chaofan was promoted, and unindicted co-conspirator Yu Zhendong ("Zhendong") became president/general manager of the Kaiping sub-branch.  When Zhendong was promoted in May 2000, Guojun took over at the Kaiping sub-branch and served as president/general manager until the Bank of China discovered the fraud in October 2001.

During their management of the Kaiping sub-branch, the three managers engaged in three types of fraud: (1) foreign exchange speculation, resulting in a loss to the Bank of China of approximately $147 million; (2)  "out-of-book" loans, which are loans that were not properly recorded in the bank's accounting system, resulting in a loss of approximately $181 million; and (3) false loans, in which loans totaling $90-95 million were entered into the bank's accounts, but the proceeds from the loans were diverted into a Hong Kong conduit company named Ever Joint.

In 1995, the Bank of China conducted a foreign exchange audit including the Kaiping sub-branch. To avoid discovery of the foreign currency exchange losses, Chaofan, Guojun, and Zhendong directed Kaiping sub-branch employees to falsify bank records. These efforts succeeded. The three managers were able to pass subsequent audits by the Bank of China in the same way.

During the course of the fund diversions, Chaofan, Guojun, Wanfang, and Yingyi entered into false marriages with spouses who held valid United States immigration status. The purpose of the false marriages was to gain residency status in the United States to avoid Chinese Law enforcement.

During the time alleged in the indictment, Chaofan, Guojun, Wanfang, and Yingyi made numerous gambling trips to Macao, Australia, Malaysia, and the Philippines. These trips were financed with wire transfers totaling more than $80 million from Ever Joint accounts. Using counterfeit visas and passports, the group also traveled to Las Vegas in 2000 and 2001, where they stayed at casino hotels and spent substantial sums playing baccarat. The gambling money was arranged through intermediaries who used cashier's checks drawn from Ever Joint accounts to set up credit lines at the casinos. The Las Vegas gambling money included wire transfers totaling over $2 million from Ever Joint accounts that resulted in checks being issued by the casinos to the intermediaries to facilitate the return of the funds to Defendants for their personal use.

On October 12, 2001, due to a change in accounting procedures, the Bank of China discovered a $482 million discrepancy in bank records that was attributed to the Kaiping sub-branch. Chaofan and Guojun fled to Hong Kong. Using their fraudulent passports and visas, they flew to Vancouver, British Columbia, and continued on to Las Vegas. Chaofan and Guojun then discovered that Chinese authorities had frozen the $8 million that they had transferred to Caesars Palace casino for their personal use. Wanfang and Yingyi fled separately to Vancouver and then to the United States

using their fraudulently obtained immigration status. The United States does not have an extradition treaty with China.

Zhendong was arrested in Los Angeles on December 19, 2002. Zhendong pleaded guilty to federal charges and agreed to return to China. He cooperated with the FBI in the investigation and prosecution of Defendants. *Id.* Guojun and Yingyi were arrested in Wichita, Kansas, on September 22, 2004. Chaofan and Wanfang were arrested in Edmond, Oklahoma, on October 6, 2004.

In the second superseding indictment, Defendants were charged with RICO conspiracy in violation of 18 U.S.C. § 1962(d) (count one), money laundering conspiracy in violation of 18 U.S.C. § 1956(h) (count two), conspiracy to transport stolen money in violation of 18 U.S.C. § 371 (count three), use of a fraudulently obtained visa in violation of 18 U.S.C. §§ 1546(a) & 2 (counts four through nine), and use of a fraudulent passport in violation of 18 U.S.C. §§ 1542 & 2 (counts ten through fifteen).

From February 2005 through early 2008, the parties were involved in lengthy pretrial motions and discovery, including two rounds of videotaped depositions of witnesses who either lived in or were incarcerated in China. The government, together with Defendants and their counsel, conducted the depositions from Las Vegas, Nevada, via video link with the witnesses in China. Defendants cross-examined each witness. Defendants waived their right to be present in China to confront the witnesses face to face.

After a 38-day trial (from June 10, 2008, to August 29, 2008), the jury convicted Defendants on all counts. The district court sentenced Chaofan to 25 years in prison, Guojun

to 22 years, and Wangfan and Yingyi to 8 years each. The court also sentenced each defendant to three years of supervised release, and entered restitution orders totaling $482 million. Defendants timely appealed to this court. The appeals were assigned to this panel and consolidated.

We granted the government's motion to expand the record for this appeal to include 31 DVDs containing the complete, unedited video depositions for all witnesses who appeared at trial.

## II. Defendants' Count One Rico Conspiracy Convictions

### A. Count One Activities

Viewed as a whole, the activities subject to count one encompass a unified scheme, wherein the Defendants: stole as much money as possible from the Bank of China; transferred the stolen funds out of China; escaped, through immigration fraud, to a safe harbor in the United States; and then spent the funds in, among other places, Las Vegas casinos. Defendants were thus engaged in an international enterprise, using many of the tools of the global economy. We therefore consider RICO's application in a multinational context.

### B. Extraterritorial Application of Rico

Defendants argue that their count one convictions are invalid because the charged conspiracy was extraterritorial and outside the reach of RICO. We review *de novo* a challenge to the extraterritorial application of criminal statutes. *See Vasquez-Velasco*, 15 F.3d 833, 838–40 (9th Cir. 1994); *see also United States v. Felix-Gutierrez*,

940 F.2d 1200, 1203–04 (9th Cir. 1991); *Chua Han Mow v. United States*, 730 F.2d 1308, 1311 (9th Cir. 1984).

In *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869, 2875 (2010), the Supreme Court confronted the question whether § 10(b) of the Securities Exchange Act applies extraterritorially. The Court began its analysis under the premise that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Id.* at 2878. The Court then concluded that, because § 10(b) contained no "affirmative indication" of extraterritorial effect, it could not be applied extraterritorially. *Id.* at 2883.

In the wake of *Morrison*, this circuit has not considered whether RICO applies extraterritorially. We have previously held, however, that RICO is silent as to its extraterritorial application. *See Poulous v. Caesars World, Inc.*, 379 F.3d 654, 663 (9th Cir. 2004). Other courts that have addressed the issue have uniformly held that RICO does not apply extraterritorially. *See generally Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 33 (2d Cir. 2010); *European Cmty. v. RJR Nabisco, Inc.*, 2011 WL 843957, at *5 (E.D.N.Y Mar. 8, 2011); *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 913 (C.D. Cal. 2011); *Sorota v. Sosa*, 842 F. Supp. 2d 1345, 1349 (S.D. Fla. 2012). Although those cases addressed the civil rather than the criminal RICO statute, they are faithful to *Morrison*'s rationale: "Rather than guess anew in each case, this Court applies the presumption [against extraterritorial application] in all cases, preserving a stable background against which Congress can legislate with predictable effects." *Morrison*, 130 S. Ct. at 2881. Therefore, we begin the present analysis with a presumption that RICO does not apply extraterritorially in a civil or criminal context.

Defendants argue that because RICO does not apply extraterritorially, the government cannot apply the statute in this case because the conspiracy took place in China and Hong Kong, not the United States.  Defendants define the enterprise as having two parts.  Indeed, Defendants were charged here with membership in a criminal enterprise that involved not only embezzlement against the Bank of China that occurred in China and Hong Kong (part one) but also immigration fraud to escape to the United States with their ill-gotten gains (part two).  Accordingly, we must determine whether under the circumstances of this case RICO can be lawfully applied to any, or all, of Defendants' conduct—foreign or domestic.  *See id.* at 2884 (the "presumption here (as often) is not self-evidently dispositive, but its application requires further analysis.").

## C.  Determining RICO's Focus

*Morrison* frames the extraterritorial inquiry in terms of "the 'focus' of congressional concern" in enacting the statute. *Id.*  The *Morrison* Court further defined the concept of focus in terms of the "objects of the statute's solicitude" and "th[e] transactions that the statute seeks to regulate."  *Id.* (internal quotation marks omitted).

The inquiry into RICO's focus is far from clear-cut.  *See In re Toyota*, 785 F. Supp. 2d at 914 ("It is unclear how *Morrison*'s logic, which evaluates the 'focus' of the relevant statute, precisely translates to RICO.").  The Second Circuit side-stepped the issue by summarily declaring in *Norex* that the defendants' "slim contacts with the United States . . . are insufficient to support extraterritorial application."  *Norex*, 631 F.3d at 33 (2d Cir. 2010).  Given *Morrison*'s detailed

analysis regarding the focus of the Exchange Act, however, our best path forward is to determine RICO's focus.

Courts that have addressed the issue fall essentially into two camps. One camp asserts that RICO's focus is on the enterprise. *See, e.g.*, *Cedeno v. Intech Group, Inc.*, 733 F. Supp. 2d 471, 473 (S.D.N.Y. 2010); *European Cmty.*, 2011 WL 843957, at \*5; *Farm Credit Leasing Servs. Corp. v. Krones, Inc.* (*In re Le-Nature's, Inc.*), 2011 WL 2112533, at \*3 n.7 (W.D. Pa. May 26, 2011) (adopting the enterprise-focused model but acknowledging that "RICO may have more than one 'focus'—including, for example, the pattern of racketeering activity required by the statute."); *Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, 2012 WL 1657108, at \*4 (N.D. Cal. May 10, 2012); *In Re Toyota*, 785 F. Supp. 2d at 914; *United States v. To*, 144 F.3d 737, 744 (11th Cir. 1998) (a pre-*Morrison* case); *United States v. Hoyle*, 122 F.3d 48, 51 (D.C. Cir. 1997) (a pre-*Morrison* case).

The other camp asserts that RICO's focus is on the pattern of racketeering activity. *See, e.g.*, *Agency Holding v. Malley-Duff*, 483 U.S. 143, 154 (1987) ("the heart of any RICO complaint is the allegation of a pattern of racketeering.") (emphasis in original omitted); *United States v. Philip Morris USA, Inc.*, 783 F. Supp. 2d 23, 29 (D.D.C. 2011) (addressing the possibility that domestic conduct could provide the basis for a foreign corporation's RICO liability); *CGC Holding Co. v. Hutchens*, 824 F. Supp. 2d 1193, 1209 (D. Colo. 2011) (citing *Philip Morris*, 783 F. Supp. 2d at 29); *Chevron Corp. v. Donziger*, 2012 WL 1711521, at \*7–8 (S.D.N.Y. May 14, 2012) (quoting *CGC Holding Co.*, 824 F. Supp. 2d at 1209–10); *In re Le-Nature's Inc.*, 2011 WL 2112533, at \*3 n.7; *accord* Note, R. Davis Mello, *Life After* Morrison*:*

*Extraterritoriality and RICO*, 44 VAND. J. TRANSNAT'L L.
1385, 1411 (2011) (arguing that courts should "apply RICO
in any case where a plaintiff alleges the commission of
enough predicate acts in the United States within the statutory
time period to establish a 'pattern of racketeering activity,'
even if the 'enterprise' is a foreign enterprise or the scheme
involves the commission of predicate acts in a foreign
jurisdiction.").

We address both models in turn.

### 1. Focus on the Enterprise

Two district courts in the Second Circuit have concluded
that the focus of RICO is on the enterprise—specifically,
domestic enterprises.

In *Cedeno*, 733 F. Supp. 2d at 472,  the district court
addressed extraterritorial application of RICO in a civil action
seeking damages arising out of a wide-ranging money
laundering scheme through which Venezuelan nationals used
United States banks as conduits for fraudulently obtained
funds.  The scheme's contacts with the United States were
limited to the movement of currency into and out of New
York bank accounts. *Id.*  After determining that the focus of
RICO is on "the enterprise as the recipient of, or cover for, a
pattern of racketeering activity," the court held that "RICO
does not apply where . . . the alleged enterprise and the
impact of the predicate activity upon it are entirely foreign."
*Id.* at 474.

In *European Community*, 2011 WL 843957, at \*5, the
district court, upon examining the elements of RICO,
concluded that "the statute does not punish the predicate acts

of racketeering activity—indeed, each predicate act is, itself, a separate crime—but only racketeering activity in connection with an enterprise." Thus, the "object of [RICO's] solicitude, and the focus of the statute" is the enterprise. *Id.* (internal quotation marks omitted). The court concluded that a RICO enterprise "must be a domestic enterprise." *Id.*

Determining the geographic location of an enterprise—whether foreign or domestic—is a difficult inquiry, however. *See Chevron*, 2012 WL 1711521, at *6 ("the emphasis on whether the RICO enterprise is domestic or foreign simply begs the question of how to determine the enterprise's character."). Two district courts have addressed the issue of determining geographic location by utilizing the "nerve center" test. *See European Cmty.*, 2011 WL 843957, at *5–6; *Mitsui O.S.K. Lines*, 2012 WL 1657108, at *4–5. The nerve center test originated as "the vehicle of choice" in determining the principle place of business for a corporation when analyzing a federal court's diversity jurisdiction. *See European Cmty.*, 2011 WL 843957, at *5 (internal quotation marks omitted) (citing *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1192 (2010)). The nerve center test focuses on where the enterprise's decisions are made, as opposed to carried out, and thus centers on the "brains" of an enterprise, not the "brawn". *European Cmty.*, 2011 WL 843957, at *6.

*European Community* and *Mitsui O.S.K. Lines* entailed a fairly straightforward application of the nerve center test that resulted in different conclusions regarding extraterritoriality. The *European Community* court concluded that a money-laundering scheme that originated in South America and Europe "issued from those criminal organizations located in South America and Russia—not . . . in the United States,"

and, consequently, the enterprise was extraterritorial. 2011 WL 843957, at *2–3, *7. *Mitsui O.S.K. Lines* involved a fraudulent shipping scheme conceived by United States corporations but executed primarily overseas. 2012 WL 1657108, at *1, *7. In that case, the decision making process of the criminal enterprise "occurred substantially within the territory of the United States," and, thus, the enterprise was considered domestic. *Id.* at *7.

Both courts emphasized the administrative ease, familiarity, and consistency of the nerve center test. *European Cmty.*, 2011 WL 84397, at *6; *Mitsui O.S.K. Lines*, 2012 WL 1657108, at *5. Both courts realized, however, that application of the nerve center test could lead to "artificially simplified results," *Mitsui O.S.K. Lines*, 2012 WL 1657108, at *4, and that "hard cases" will arise that do not "in all instances, automatically generate a result," *European Cmty.*, 2011 WL 84397, at *6. Indeed, as the Supreme Court has noted, "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States." *Morrison*, 130 S. Ct. at 2884 (emphasis in original).

The case before us presents just such a hard case that illuminates the inadequacy of the nerve center test and the enterprise-based model upon which it relies. As the *Chevron* court pointed out, the nerve center test could "produce absurd results" when applied to a hypothetical criminal prosecution of two separate corporate entities—one foreign and one domestic—both engaged in the same pattern of criminal activity in the territorial United States. *See Chevron*, 2012 WL 1711521, at *6. The court labeled "risible" the notion that the domestic corporation would be culpable whereas the foreign corporation would be immune from prosecution

simply because its ringleaders had the forethought to incorporate overseas. *Id.* This is sound reasoning.

The geographic location of an enterprise may be relevant under certain factual scenarios, like the criminal schemes at issue in *European Community* and *Mitsui O.S.K. Lines.* But in a case like this one, where the "brains" of the operation were located overseas but the enterprise violated United States immigration law in the United States, "there is no necessary or . . . even probable connection between where the RICO enterprise makes its decisions and whether the application of RICO to the racketeering activity at issue . . . was the sort of activity with which Congress would have been concerned." *Chevron*, 2012 WL 1711521, at *7. Moreover, while administrative simplicity may be "a major virtue in a jurisdictional statute." *Hertz* , 130 S. Ct. at 1193, a statute's extraterritorial reach is a merits question, not a question of subject-matter jurisdiction. *See Morrison*, 130 S. Ct. at 2877 ("to ask what conduct [a statute] reaches is to ask what conduct [a statute] prohibits, which is a merits question."). Therefore, an inquiry into the application of RICO to Defendants' conduct is best conducted by focusing on the pattern of Defendants' racketeering activity as opposed to the geographic location of Defendants' enterprise.

## 2.  Focus on the Pattern of Racketeering Activity

"[T]he heart of any RICO complaint is the allegation of a pattern of racketeering." *Agency Holding*, 483 U.S. at 154 (emphasis in original omitted); *see also H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 236 (1989) (describing "RICO's key requirement of a pattern of racketeering"). As noted, several post-*Morrison* courts have determined that RICO's focus is on the pattern of racketeering activity for purposes of

analyzing extraterritorial application of the statute. *Philip Morris, Inc.*, 783 F. Supp. 2d at 29; *CGC Holding Co.*, 824 F. Supp. 2d at 1209; *Chevron*, 2012 WL 1711521, at *7–8.

RICO's statutory language and legislative history support the notion that RICO's focus is on the pattern of racketeering activity. For example, 18 U.S.C. § 1962(c), which forms the basis of Defendants' count one convictions, prohibits the conduct of a criminal enterprise's affairs "through a pattern of racketeering activity." Other sections prohibit the use of funds derived from a pattern of racketeering activity in the investment in or acquisition of an enterprise involved in interstate commerce. *Id.* §§ 1962(a)–(b). Furthermore, RICO's legislative history shows that the statute was enacted to promote "the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies *to deal with the unlawful activities* of those engaged in organized crime." *Organized Crime Control Act of 1970, Statement of Findings and Purpose*, Pub. L. No. 91-452, 84 Stat. 922 (1970) *reprinted in* 1970 U.S. Code Cong. & Admin. News 1073 (emphasis added).

Given this express legislative intent to punish patterns of organized criminal activity in the United States, it is highly unlikely that Congress was unconcerned with the actions of foreign enterprises where those actions violated the laws of this country while the defendants were in this country. *See Chevron*, 2012 WL 1711521, at *6. Thus, to determine whether Defendants' count one convictions are within RICO's ambit, we look at the pattern of Defendants' racketeering activity taken as a whole.

### 3.  Application to the Case at Hand

The second superseding indictment describes two parts of the enterprise:  (1) "Enriching the members and associates . . . through among other things, fraud, money laundering, and foreign and interstate transfer of funds," and (2) "Enabling the members and associates . . . through marriage, passport, and visa fraud, to travel, among other countries . . . [including] the United States, and to flee China and Hong Kong in the event that the criminal activity of the Enterprise was discovered."   One part consisted of racketeering activities conducted predominantly in China, and one part consisted of racketeering activities in the United States.

The first part centers on the Bank of China fraud and, to the extent it was predicated on extraterritorial activity, it is beyond the reach of RICO even if the bank fraud resulted in some of the money reaching the United States. *See Cedeno*, 733 F. Supp. 2d at 472 ("the scheme's contacts with the United States . . . were limited to the movement of funds into and out of U.S.-based bank accounts."); *Norex*, 631 F.3d at 33 ("The slim contacts with the United States . . . are insufficient to support extraterritorial application of the RICO statute.").

The second part, however, bound the Defendants' enterprise to the territorial United States.  This second part involved racketeering activities conducted within the United States including the commission of  RICO predicate crimes based on violations of United States immigration laws, as codified in 18 U.S.C. §§ 1542, 1546(a).   Specifically, Defendants entered the United States using fraudulent visas and passports.  Defendants traveled within the United States to execute documents in furtherance of their immigration fraud and to open bank accounts.  Finally, Defendants were

arrested in Kansas and Oklahoma in possession of these fraudulent immigration documents.

By conspiring to enter and hide out in the United States with the fruit of their ill-gotten gains, Defendants engaged in an enterprise that had the implicit goal to breach United States immigration law in furtherance of the overall goal of the enterprise. The dual parts of Defendants' enterprise were necessarily conjoined in pursuit of that goal—i.e., to steal large sums of money from the Bank of China and to get away with it in the United States. Defendants intended to use the immigration fraud to consummate the purpose of the enterprise: to acquire the money and safely enjoy it the United States, beyond the reach of Chinese law. Without the immigration fraud, the bank fraud would have been a dangerous failure. *See, e.g.*, *CGC Holding Co.*, 824 F. Supp. 2d at 1210 ("In the present case, the conduct of the enterprise within the United States was a key to its success.").

In sum, Defendants' violations of United States immigration laws fall squarely within RICO's definition of racketeering activity. *See* 18 U.S.C. § 1961(1)(B) (listing 18 U.S.C. §§ 1542, 1546 as RICO predicates); *cf. Rocha v. United States*, 288 F.2d 545, 548 (9th Cir. 1961) (sham marriages in violation of § 1542 are "crimes directed toward the sovereign itself [and] may be tried within the jurisdiction even though committed without") (internal quotation marks omitted). Defendants' pattern of racketeering activity may have been conceived and planned overseas, but it was executed and perpetuated in the United States. Under *Morrison*, we look "not upon the place where the deception originated," but instead upon the connection of the challenged conduct to the proscription in the statute. 130 S. Ct. at 2884.

Having determined that RICO's focus is on the pattern of racketeering activity, we conclude that Defendants' criminal plan, which included violation of United States immigration laws while the Defendants were in the United States, falls within the ambit of the statute.

We affirm Defendants' count one convictions because the convictions are not based on an improper extraterritorial application of RICO, but rather are based on a pattern of racketeering activities that were conducted by the Defendants in the territorial United States.[2]

## III.     Defendants' Count Two Convictions for Money Laundering Conspiracy

Defendants challenge the sufficiency of the evidence on their count two convictions for conspiracy in violation of 18 U.S.C. § 1956(h).  We review sufficiency of the evidence challenges *de novo* to determine whether, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original omitted); *accord United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc).

---

[2] It was constitutional error for the jury to be instructed on the first part of the second superseding indictment, to the extent that this part of the indictment was predicated on extraterritorial activity that is not a basis for RICO liability.  *See Hedgpeth v. Pulido*, 555 U.S. 57, 60 (2008).  However, the error was harmless beyond a reasonable doubt as the "evidence was overwhelming" as to the second part of the second superseding indictment, and the jury would have convicted on the basis of that evidence alone. *United States v. Green*, 592 F.3d 1057, 1071 (9th Cir. 2010).

Conviction under § 1956(h) with the object of the conspiracy being a violation of 18 U.S.C. § 1957(a) requires proof that Defendants agreed to engage in a monetary transaction over $10,000 derived from a criminal act. *See* 18 U.S.C. §§ 1956(h), 1957(a); *United States v. Alghazouli*, 517 F.3d 1179, 1190 (9th Cir. 2008). Defendants allege that the government introduced no evidence connecting their monetary transactions to any theft or fraud. Defendants also raise a jurisdictional challenge to the application of § 1957(a).

Defendants argue that the government cannot trace the money used by the Defendants in the United States to any money obtained fraudulently from the Bank of China, and that this inability to trace is fatal to their count two convictions. Generally, a conviction under § 1957 requires that the government be able to trace the money transactions at issue to a criminal act. *United States v. Rutgard*, 116 F.3d 1270, 1291–92 (9th Cir. 1997). The government concedes that they are unable to trace the proceeds of the Bank of China fraud directly to the money brought into the United States. At best, the government can show only that the "vast majority" of the funds in Ever Joint accounts were fraudulently obtained.

But Defendants were charged with conspiracy, a crime that does not require completion of the object offense. *See United States v. Alvarez-Cardenas*, 902 F.2d 734, 736 (9th Cir. 1990) ("a conspiracy conviction does not turn on the question of whether defendant succeeds in doing all he attempted to do."). The conspiratorial agreement represents the crystallization of the conspirator's culpable criminal intent; accomplishment of the underlying crime is immaterial to culpability. *United States v. Cruz*, 127 F.3d 791, 803 (9th Cir. 1997) (Hall, J., concurring in part and dissenting in part),

*abrogated on other grounds by United States v. Jimenez Recio*, 537 U.S. 270 (2003). Contrary to the Defendants' contention, no tracing is necessary in this case. The agreement itself establishes that the funds to be transferred are a portion of the illegally derived proceeds. All that is required here, where the crux of Defendants' count two convictions is that Defendants *agreed* to transfer to the United States more than $10,000 *in fraudulent proceeds*, is that: there was an agreement to transfer that amount of the "fraudulent proceeds"; and Defendants' criminal intent was corroborated by "significant objective acts." *United States v. Posey*, 864 F.2d 1487, 1492 n.4 (9th Cir. 1989). A formal agreement is not necessary; rather, the agreement may be inferred from the defendants' acts pursuant to the scheme, or other circumstantial evidence. *United States v. Bibbero*, 749 F.2d 581, 587 (9th Cir. 1984).

At trial, through the video deposition testimony of Zhendong and the direct testimony of Bank of China auditors, the government introduced evidence that Chaofan and Guojun engaged in various acts of fraud during their tenure as managers at the Kaiping sub-branch. They engaged in unauthorized foreign currency speculation. They concealed the immense losses resulting from this speculation, almost $150 million, by manipulating Bank of China account records. Chaofan also approved loans, totaling approximately $181 million, from the Kaiping sub-branch to local Kaiping businesses that were not properly recorded in the Bank of China accounting system. The interest payments for those loans were channeled into Ever Joint accounts, which were controlled by Chaofan and Guojun. The government also introduced evidence of "false loans," totaling $90–95 million from the Kaiping sub-branch, that were approved by Chaofan and intended for various Kaiping businesses but were actually

diverted to Ever Joint accounts. Zhendong testified that Chaofan authorized the loans, Guojun tracked the money as it flowed into Ever Joint accounts, and all three men discussed the need to alter bank records to conceal the massive losses.

The government also introduced testimony regarding the structure of the Ever Joint company and its relation to Chaofan and Guojun's criminal activities. Specifically, the government introduced evidence that Chaofan was the primary owner of Ever Joint during the course of its history. Zhendong testified that he and Chaofan made false representations that the Bank of China owned Ever Joint and made payments using Ever Joint funds to influence at least one Chinese government official. The government's accounting expert testified that Ever Joint had "no commercial justification" but rather served as a "conduit for funds" in order for Ever Joint's principals to engage in activities consistent with money laundering. Zhendong testified that Chaofan and Guojun were aware of the corporate structure and mission of Ever Joint and were aware that Ever Joint would be funded from money sourced from the Bank of China. Zhendong testified that he, Chaofan, and Guojun paid an accountant, Yu Hongbin, to make transfers from the Bank of China to Ever Joint to cover expenses. These transfers involved the use of bank customer names and account information on official loan documents to transfer the loan proceeds to Ever Joint through "underground banks" to evade China's banking regulators. Zhendong characterized this activity as "stealing" the customers' money from Kaiping sub-branch accounts and transferring the money to Ever Joint. Zhendong testified that Chaofan oversaw a team of accountants, including Chaofan's cousin and his cousin's wife, who altered the account records to evade detection.

To be sure, the record reflects that Ever Joint engaged in real estate investments that could have been legitimate, including purchase and renovation of real estate in Hong Kong.[3] Zhendong testified, however, that speculation in foreign currency was greater in volume than Ever Joint's real estate related activity. And the record reflects that, from 1995–2001, Chaofan, who determined Ever Joint bonuses, received 1.7 billion Hong Kong dollars ($218 million U.S.) and Guojun received 290.9 million Hong Kong dollars ($37.3 million U.S.) in Ever Joint bonus payments. During the entire time they worked at Bank of China, Chaofan never earned more than $40,000 per year for his work with the bank and Guojun's maximum salary was $30,000 per year.

The government also introduced evidence that Defendants intended to transfer Ever Joint funds into the United States to facilitate escape from Chinese authorities once their fraud was discovered. Specifically, Zhendong testified regarding an agreement between himself, Chaofan and Guojun to transfer millions of dollars to Caesars Palace casino to fund their escape to the United States. This money came from Ever Joint accounts.

Defendants Wanfang and Yingyi similarly engaged in activities that show their intent to conspire with Chaofan and Guojun to bring fraudulently obtained funds into the United States. According to Zhendong, Wanfang and Yingyi entered into false marriages to acquire residency status in the United States in order to flee there in the event their husbands' bank fraud was discovered. These false marriages were facilitated

---

[3] Although Defendants allege that these real estate investments were legitimate, Zhendong testified that Chaofan and Guojun improperly used Bank of China assets to fund Ever Joint's real estate purchases as well.

by a Kaiping government clerk who testified that he had altered marriage records to remove evidence of Chaofan's marriage to Wanfang and Guojun's marriage to Yingyi. Wanfang's and Yingyi's false marriages with American citizens were set up by intermediaries. Neither Wanfang nor Yingyi ever lived with their respective sham spouses as husband and wife. Wanfang was naturalized as an American citizen on June 22, 2000, and she divorced her fake spouse on July 28, 2000. Yingyi was naturalized on November 10, 1999, and she divorced her fake spouse on April 17, 2001. At the time of their arrests in September 2004, Guojun and Yingyi had been reunited and were living in Kansas. By the time they were arrested in Oklahoma in October 2004, Chaofan and Wanfang had also been reunited.

Evidence introduced at trial also showed that on at least one occasion Wanfang and Yingyi traveled to Las Vegas with Chaofan and Guojun and gambled with funds that, as described above, were linked to Ever Joint. Specifically, Defendants traveled to Las Vegas on or about October 4, 2000, and gambled at the Rio and Bellagio casinos using two million dollars drawn from the Hua Chao Commercial Bank in Hong Kong. These funds were sent to the Defendants in Las Vegas via Wanfang's brother, Kwong Wa Po, and the funds were booked in Ever Joint's ledger as a loan.

In light of the foregoing, viewing the evidence in the government's favor, a rational juror could find that the Defendants violated § 1956(h) by conspiring to defraud the Bank of China through activities related to the Ever Joint company and that they conspired to engage in transactions with domestic casinos using more than $10,000 of the illegally derived funds. Conspiracy does not require completion of the substantive crime. It requires an intent to

complete the substantive crime. Defendants' intent can reasonably be inferred from their actions pursuant to the scheme. Section 1957(d)'s jurisdictional requirement is met because the transactions took place in the United States. Therefore, we affirm Defendants' convictions on count two.

## IV. Defendants' Count Three Convictions for Conspiracy to Transport Stolen Money

Conviction for conspiracy to violate § 2314, count three, requires proof beyond a reasonable doubt that Defendants agreed to move at least $5000 into the United States while "knowing the same to have been stolen, converted or taken by fraud." 18 U.S.C. § 2314. The count three conspiracy also requires at least one overt act in furtherance of the agreement. 18 U.S.C. § 371. We review *de novo* Defendants' challenge to the sufficiency of the evidence, and we make all inferences in favor of the government.

Defendants raise essentially the same challenge to their count three convictions as they did regarding their count two convictions—namely, that the government cannot trace the Las Vegas casino transactions to the Bank of China fraud. Their arguments fail under the same analysis as discussed above. Conspiracy is an inchoate offense that centers upon the agreement to commit an unlawful act, not the commission of the unlawful act itself. *Cruz*, 127 F.3d at 803. Therefore, this case is distinguishable from *United States v. Lazarenko*, in which we reversed a conviction because the substantive § 2314 charge requires that the transferred money be directly traceable to the underlying fraud. 564 F.3d 1026, 1042 (9th Cir. 2009).

We affirm Defendants' count three convictions here because evidence in the record, summarized above, supports a finding that Defendants agreed to commit the acts prohibited by § 2314. Through the testimony of Zhendong, forensic accounting experts, and Defendants' false spouses, the government introduced evidence sufficient to allow a rational juror to find that Defendants reached an agreement to steal large sums of money from the Bank of China and to use that money, channeled through Ever Joint accounts, in the United States.

## V. Defendants' Sixth Amendment Objections to the Video Deposition Testimony at Trial

The government presented the jury with fourteen days of videotaped deposition evidence involving witnesses in China. During presentation of the evidence, it became clear that the video replay was consuming a large amount of court time, resulting in delay and juror fatigue. Accordingly, the district court, with the consent of all parties, approved an edited version of the videotapes to be shown to the jury. The edited version omitted the translation into Chinese of counsel's questions in English, but it left unaltered the English questions, the witnesses' responses in Chinese, and the English translations of the Chinese responses.

Defendants argue that the edited version violated their Sixth Amendment rights to a fair trial and to confront the witnesses against them.[4]  Because the Defendants failed to

---

[4] Defendants also argue that their Confrontation Clause rights were violated when the videotaped deposition testimony was admitted without the government making a showing at trial that the witnesses were unavailable. As Defendants concede, however, this argument is waived

object at the time the deposition testimony was introduced into evidence, we review for plain error. *See United States v. Matus-Zayas*, 655 F.3d 1092, 1101 n.7 (9th Cir. 2011).

Defendants raise two main challenges to the presentation of the videotaped testimony. First, they argue that they were denied a fair trial because the replay subjected the jury to "brutally boring 'spurts' of video-taped deposition testimony, marked by computer difficulties, erroneous redactions, and confusing names." Second, Defendants argue that the edited video depositions impeded the jury's ability to observe the witnesses' demeanor and body language while they were being asked questions in their native language.

Regarding the fair trial argument, the parties do not dispute that portions of the trial were long or that juror attentiveness was an issue. Recognizing these problems, the district court took steps to help the jury by clarifying the names and roles of the parties, and by placing in the courtroom a face and name chart of all relevant persons. The district court also addressed juror attentiveness by dismissing one of the alternate jurors who appeared to be falling asleep. These actions were reasonable steps in managing a lengthy and difficult trial. *See, e.g.*, *United States v. Springfield*, 829 F.2d 860, 864 (9th Cir. 1987) (no abuse of discretion where the district court took steps to ensure that missed testimony was insubstantial).

Turning to Defendants' Confrontation Clause argument, we reiterate that the major purposes of the Confrontation Clause are "(1) ensuring that witnesses will testify under

---

because they raised it for the first time in the reply brief. *See Bazuaye v. I.N.S.*, 79 F.3d 118, 120 (9th Cir. 1996).

oath; (2) forcing witnesses to undergo cross-examination; and (3) permitting the jury to observe the demeanor of witnesses." *United States v. Sines*, 761 F.2d 1434, 1441 (9th Cir. 1985) (internal citations omitted). The district court conducted a hearing during trial on the problems posed by video replay of the depositions. The district court stated that editing the tapes would speed up the proceedings while still allowing the jury to view the body language of the witnesses as they responded to questions. On this appeal, we granted the governments' motion to expand the record to include thirty-one DVDs with complete unedited versions of the depositions, and we have reviewed that evidence. These DVDs reveal that the jury was exposed to relevant witness body language and demeanor even taking into account the district court's edits. The fact that the Defendants consented at trial to the edited format and participated in crafting the structure for the edits further militates against their assertion that the jury was deprived of the opportunity to evaluate witness demeanor.

In sum, the district court did not plainly err in its treatment of videotaped testimony at trial, and Defendants' rights under the Confrontation Clause were not violated.[5]

## VI.    Defendants' Expert Witnesses

Defendants challenge the district court's ruling that limited the testimony of three defense expert witnesses: Professor John Copper, Professor Andy Sun, and Professor Victor Shih. The district court's decision to admit or exclude

---

[5] Defendants' argument that they have been deprived of the opportunity for meaningful appellate review because the government failed to enter the videos into the record has been mooted by our decision to grant the government's motion to expand the record.

expert testimony is reviewed for an abuse of discretion. *See United States v. Freeman*, 498 F.3d 893, 900–01 (9th Cir. 2007). Abuse of discretion is evaluated by looking at whether the trial court determined the correct legal rule to apply to the requested relief and then at whether the trial court's application of that rule was (1) "illogical," (2) "implausible," or (3) without "support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1264 (9th Cir. 2009) (en banc) (citation omitted).

"The admissibility of expert testimony is a subject peculiarly within the sound discretion of the trial judge, who alone must decide the qualifications of the expert on a given subject and the extent to which his opinions may be required." *Fineburg v. United States*, 393 F.2d 417, 421 (9th Cir. 1968). The district court conducted an extensive voir dire of the witnesses outside the presence of the jury.

Defendants sought to have Copper testify about the economic and political structure in China at the time of the Defendants' criminal activities at the Bank of China, about defendant Guojun's military service, and about Chinese family structure and sociology. Defendants sought to have Sun testify about the Chinese legal system, and they sought to have Shih testify about the effect of Communist Party politics on China's banking system, including the operation of the Bank of China. The district court allowed Copper's testimony on the comparative political and economic situations in China and Hong Kong, and allowed brief discussion of defendant Guojun's military status. However, the court found Copper unqualified to testify regarding the respective roles of spouses in China because his experience on that issue was merely anecdotal. After a long colloquy,

the court allowed Sun's testimony regarding the double designation experience—whereby persons suspected of criminal activity are subjected to isolated, indeterminate detention during pending administrative and criminal investigations.    The district court also allowed Shih's testimony on "monitoring rooms"—rooms where bank officials monitor activities at the branch and consider whether to pursue Communist Party disciplinary actions—and differences between private and state-owned banks in China, but the court excluded his testimony on out-of-book loans because Shih did not actually review any records for the transactions at issue in the case.

In allowing all three defense witnesses to testify, the district court adhered to circuit precedent requiring that expert testimony be "construed liberally" in considering admissibility.  *See United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000).  In light of the reasons stated at the hearing, the district court understood its function as an evidentiary gatekeeper and took seriously its responsibility to admit only expert testimony that would help the jury determine relevant issues.  Therefore, the district court did not abuse its discretion in limiting the testimony of Defendants' expert witnesses.

## VII.    Jury Instructions

Defendants raise seven challenges to the jury instructions. "In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *United States v. Garcia-Rivera*, 353 F.3d 788, 792 (9th Cir. 2003) (internal quotation marks omitted).

## A.  Burden Shift Argument

Defendants argue that the inclusion of twenty statements of what the government did not have to prove to meet certain elements of the charged offenses impermissibly shifted the burden to the defense by lessening the government's burden of proof.  Defendants also allege that the district court erred in failing to include specific language in the jury instructions that the Defendants must be presumed innocent "unless and until" proven guilty.

Challenges to the formulation of jury instructions are generally reviewed under an abuse of discretion standard.[6] *See United States v. Dearing*, 504 F.3d 897, 900 (9th Cir. 2007).  Plain error review applies here, however, because Defendants did not adequately preserve the burden-shifting issue for appeal.[7]

The district court repeatedly instructed the jury regarding the correct burden of proof.  Specifically, the instructions

---

[6] Defendants' assertion that *de novo* review applies pursuant to *United States v. Shannon*, 137 F.3d 1112, 1117 (9th Cir. 1998), is incorrect. *See United States v. Heredia*, 483 F.3d 913, 922 (9th Cir. 2007) (en banc) (*overruling Shannon* and reiterating the general applicability of abuse of discretion review to the formulation of jury instructions).

[7] The record reflects two opportunities for preservation of this issue. First, Defendants raised an objection to the government's proposed instructions on count two.  After consultation, however, Defendants withdrew their objection, thereby waiving it. *See United States v. Masters*, 118 F.3d 1524, 1526 (11th Cir. 1997); *United States v. Thomas*, 896 F.2d 589, 591 (D.C. Cir. 1990).  Defendants' second objection became moot when the district court declined to give the challenged instruction.  Thus, Defendants did not properly preserve their burden-shifting challenge, and plain error review applies.

referred to the presumption of innocence and the government's burden to prove guilt beyond a reasonable doubt. The district court also instructed the jury that a guilty verdict must be unanimous, and that the Defendants' decision not to testify should not be used to infer guilt. Despite conclusory allegations, Defendants do not show how the twenty references to what the government did not have to prove lessened the government's burden of proof.

Furthermore, the Defendants' allegation that the district court erred in failing to include specific language that the Defendants are to be presumed innocent "unless and until" proven guilty is unavailing. Defendants' own authority, *Rhoades v. Henry*, 598 F.3d 495, 506–08 (9th Cir. 2010), subverts their argument. The *Rhoades* court professed no preference for Defendants' desired "unless and until" language. *See id.* Moreover, even if omitting such language was erroneous, when read in the context of the overall instructions, it is unlikely that the omission would cause the jury to misapply the government's burden of proof. *See id.* at 508.

## B.  Jury Instruction Based on Chinese Law

Over Defendants' objection, the district court gave the following jury instruction: "You are instructed that fraud, or a scheme or attempt to defraud the Bank of China is a felony under foreign Chinese law." Defendants argue that this instruction was improper because it: (1) took away from the jury the ability to find an essential element of the alleged crimes, (2) interpreted and sought to enforce unsettled Chinese law that is different from law applied in the United States, and (3) based its conclusions on extradition case law,

which liberally construes criminality in violation of the rule of lenity.

We review *de novo* all determinations of foreign law under Rule 26.1 of the Federal Rules of Criminal Procedure. *See United States v. Fowlie*, 24 F.3d 1059, 1064 (9th Cir. 1994). Rule 26.1 gives the district court broad discretion in considering evidence to make determinations of foreign law.[8] *See United States v. Mitchell*, 985 F.2d 1275, 1280 (4th Cir. 1993).

To support a conviction on the RICO conspiracy charge in count one and the money laundering conspiracy charge in count two, the government was required to prove that the property at issue (the funds from the Bank of China) was derived from a specified unlawful activity. The specified unlawful activity the government identified was an offense against a foreign nation involving "fraud, or any scheme or attempt to defraud, by or against a foreign bank." *See* 18 U.S.C. §§ 1956(c)(7)(B) & (B)(iii), 1957(a).

Defendants cite no case law in support of their challenge to the district court's authority to determine foreign law as a predicate to jury determination of guilt on a substantive offense. Given Rule 26.1's express grant of authority to the district court, "[i]t has long been thought . . . that the jury is not the appropriate body to determine issues of foreign law." *United States v. McClain*, 593 F.2d 658, 669 n.17 (5th Cir. 1979) (internal quotation marks omitted). The challenged

---

[8] In relevant part, Rule 26.1 states, "[i]ssues of foreign law are questions of law, but in deciding such issues a court may consider any relevant material or source--including testimony--without regard to the Federal Rules of Evidence." Fed. R. Crim. P. 26.1.

instruction here does not impinge on the jury's fact finding because the jury was still charged with determining beyond a reasonable doubt whether the underlying fraud actually took place.

Defendants' other challenges based on the "unsettled" nature of Chinese law and the district court's reliance on extradition cases are similarly unavailing. It is true that extradition treaties are construed liberally, *see United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997); however, the rule of lenity is not helpful to Defendants because the rule applies where there is ambiguity concerning the applicability of criminal statutes. *See Liparota v. United States*, 471 U.S. 419, 428 (1985); *United States v. Gonzalez-Mendez*, 150 F.3d 1058, 1061 (9th Cir. 1998) ("[W]e resort to the rule of lenity only if the statute is 'truly ambiguous.'"). No such ambiguity exists here. American law provides a straightforward definition of common fraud as, "wronging one in his property rights by dishonest methods or schemes, and usually signif[ies] the deprivation of something of value by trick, deceit, chicane or overreaching." *See McNally v. United States*, 483 U.S. 350, 359 (1987) (citation and internal quotation marks omitted), *superseded on other grounds by statute*, Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7603, codified at 18 U.S.C. § 1346, *as recognized in United States v. Stoneman*, 870 F.2d 102, 105 n.2 (3d Cir. 1989).

Chinese law is equally clear in prohibiting fraudulent acts. Articles 192 and 382 of the Criminal Law of the People's Republic of China unambiguously criminalize Defendants'

fraudulent acts against the Bank of China.[9]  Not incidentally, four other articles in the Chinese criminal code would equally cover the Defendants' convicted conduct.[10]  Consequently, Defendants' arguments based on the shortcomings of the Chinese criminal justice system fail because Defendants' fraudulent acts are unlawful in both the United States and China.

Defendants' alternative argument that the government impermissibly seeks to enforce Chinese law is meritless.  The Supreme Court has upheld criminal convictions based on interpretations of foreign law where the foreign violations are simply a means to violate United States laws.  *See Pasquantino v. United States*, 544 U.S. 349, 369 (2005).  In this case, Defendants' foreign fraud was a means to violate United States laws.  The challenged instruction incorporates

---

[9] Article 192, in relevant part, provides that "[w]hoever, for the purpose of illegal possession, unlawfully raises funds by means of fraud shall be [guilty of a crime]."  Crim. L. PRC art. 192 (adopted by the Fifth Nat'l People's Cong., July 1, 1979, revised Mar. 14, 1997) (China) *available at* http://www.cecc.gov/pages/newLaws/criminalLawENG.php.

Article 382, in relevant part, provides that "[a]ny state functionary, who, by taking advantage of his office, appropriates, steals or swindles public money or property or by other means illegally takes it into his own possession shall be regarded as being guilty of embezzlement."  Crim. L. PRC art. 382 (adopted by the Fifth Nat'l People's Cong., July 1, 1979, revised Mar. 14, 1997) (China) *available at* http://www.cecc.gov/pages/newLaws/criminalLawENG.php.

[10] *See* Crim. L. PRC arts. 193–95, 266 (adopted by the Fifth Nat'l People's Cong., July 1, 1979, revised Mar. 14, 1997) (China) (criminalizing fraud against banks and financial institutions regarding loans, financial bills, and letters of credit, as well as criminalizing swindling of public or private money) *available at* http://www.cecc.gov/pages/newLaws/criminalLawENG.php.

Chinese law only as a predicate to enforcement of the money laundering statute.

## C.  Fatal Variance Regarding Count Two

Defendants challenge the omission of the phrase "foreign commerce" from the first element in the count two money laundering instruction.  The challenged instruction states, "The elements of money laundering, as charged in the second superseding indictment, are as follows:  First, an individual engaged in or attempted to engage in a monetary transaction in or affecting interstate commerce."  Defendants allege that this omission is a fatal variance rendering their conviction on that count invalid.  Because Defendants did not object at trial, we review for plain error.

Defendants' challenge amounts to a "constructive amendment" claim, although Defendants do not use that term. A constructive amendment requires reversal and occurs "when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them."  *United States v. Hartz*, 458 F.3d 1011, 1020 (9th Cir. 2006) (internal quotation marks omitted).

Defendants' argument fails for two reasons.  First, the omission was cured by a later instruction on the same page that defines monetary transaction, as used in the challenged instruction, as a "deposit, withdrawal, transfer or exchange, in or affecting interstate or foreign commerce."  The instructions on that same page also reference "foreign commerce" two additional times.  Second, we consider the phrase "interstate or foreign commerce" to be a unitary phrase; that is, by referencing one, the other is included as

well.  *See United States v. Garcia*, 94 F.3d 57, 64 (9th Cir. 1996) (describing the phrase "interstate or foreign commerce" as "one concept").

Because Defendants were not convicted at trial of an offense broader than the one charged in the indictment, Defendants' fatal variance/constructive amendment claim fails.  *See Hartz*, 458 F.3d at 1020.

## D. Defendants' Proposed "Theory of Defense" Instructions

The denial of a defendant's jury instruction due to an inadequate factual basis is reviewed for an abuse of discretion.  *See United States v. Daane*, 475 F.3d 1114, 1119 (9th Cir. 2007).  Whether the instructions, taken as a whole, adequately cover the defense theory is a question of law reviewed *de novo*.  *See United States v. Wills*, 88 F.3d 704, 715 (9th Cir. 1996).

At trial, the Defendants requested an instruction on the necessity defense, based on the Defendants' contention that their immigration to the United States using fraudulently obtained visas was due to fear of harm if they remained in China after being caught.

Defendants invoke necessity without proper legal basis. Fear of prosecution for crimes committed is not an appropriate reason to claim necessity.  *Cf. United States v. Schoon*, 971 F.2d 193, 196–97 (9th Cir. 1991) (discussing permissible uses of the necessity defense in cases such as: prisoners escaping a burning prison, a person stealing food from a cabin to survive if lost in the woods, and destruction of property to prevent the spread of fire).

Defendants also requested three related instructions regarding governmental authorization based on the allegation that their illegal money transactions were due to requirements put in place by Chinese Communist Party leadership. Defendants base their argument on the fact that the state owned the Bank of China and the fact that the Chinese banking sector was in a period of transition at the time of the convicted offenses. The instruction is unnecessary, however, because the elements of the charged conspiracy adequately covered any claim of Chinese government approval of Defendants' actions. If the jury believed that the money transactions at issue were not fraudulent because the government approved the transactions, the jury could have found for the Defendants under the elements of money laundering and transportation of stolen money. *See United States v. Ramirez*, 710 F.2d 535, 543 (9th Cir. 1983) ("The refusal to give a requested instruction is not error if the charge as a whole adequately covers the theory of the defense." (citation and internal quotation marks omitted)). Moreover, Defendants provided no evidence that their immigration fraud was in any way connected to a government directive. *See United States v. Dorrell*, 758 F.2d 427, 430 (9th Cir. 1985) (where the evidence is insufficient to support a theory of defense, the district court need not instruct the jury on that defense). The district court did not err in refusing to give Defendants' proffered defense theory instructions.

## E.  The Aiding and Abetting Counts

Defendants argue that any conviction for aiding and abetting in the conspiracy counts (counts one through three) should be reversed because aiding and abetting was not charged on those counts in the second superseding

indictment. Plain error review applies because no objection was made at trial.

The aiding and abetting charges, under 18 U.S.C. § 2, applied to counts four through fifteen only. Defendants admit that the jury was instructed on aiding and abetting only for counts four through fifteen. Juries are presumed to follow the instructions given them. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987). There is no error here.

## F. The Absence of an Instruction Defining "On or About"

Defendants challenge the absence of an instruction defining "on or about" as used in the second superseding indictment. Although Defendants did not propose an "on or about" instruction at trial, Defendants now argue that such an instruction was needed to provide the jury with "sufficient guidance" to navigate the time frames involved in the charged crimes. Defendants did not object at trial, so we review for plain error.

Defendants cite *United States v. McCown*, 711 F.2d 1441, 1450–51 (9th Cir. 1983), and *United States v. Zepeda-Martinez*, 470 F.3d 909, 912 n.1 (9th Cir. 2006), but those cases are inapposite. They concern challenges to crimes charged during allegedly open-ended or indefinite time frames. In this case, the dates alleged are not indefinite. The RICO conspiracy was alleged to have begun in 1991 with the improper foreign currency exchange speculation that resulted in unlawful use of the Bank of China's interbranch accounts and to have ended with the arrests of Chaofan and Kuang in 2004. The conspiracies alleged in counts two and three began in 1998 and ended with the same arrests in 2004. Counts four

through fifteen allege that the various acts of immigration fraud occurred on specific dates. Defendants do not argue that the government presented evidence outside the dates outlined in the indictment or otherwise deviated from the time frames alleged in the indictment. Accordingly, we find no error.

### G. Defendants' Incomprehensibility Claims Due to Numerous Chinese Names Presented to the Jury

Defendants challenge the fairness of the proceedings based on the numerous Chinese names before the jury. Defendants argue that the names are essentially interchangeable and incomprehensible to any juror who is not familiar with Chinese, thus rendering the charging process incomprehensible. Plain error review applies because no objection was made at trial.[11]

We are not persuaded by Defendants' argument. The parties engaged in voir dire, which included a jury questionnaire inquiring about any prospective bias or difficulty with the fact that the defendants were Chinese. Several interpreters were present during trial. The district court also took steps to clarify the names and roles of the parties by placing on display in the courtroom a chart with the faces and names of all relevant persons. Furthermore, Defendants point to no specific evidence of prejudice warranting reversal on these grounds.

---

[11] Defendants allege that they preserved this claim of error during the jury instructions hearing. The colloquy, however, dealt only with the jury instructions in general and did not reference the Chinese language issues specifically enough to preserve the issue for appeal. *See United States v. Klinger*, 128 F.3d 705, 711–12 (9th Cir. 1997).

In sum, Defendants' seven challenges to the jury instructions are meritless.

## VIII.   Sentencing Issues

### A.  Application of the 2007 Sentencing Guidelines

Defendants argue that the application of the 2007 Guidelines to their sentences violates the *Ex Post Facto* Clause of the Constitution. We review *de novo* the district court's interpretation of the Sentencing Guidelines, including challenges under the *Ex Post Facto* Clause. *United States v. Staten*, 466 F.3d 708, 713 (9th Cir. 2006).

The district court "shall use the Guidelines Manual in effect on the date that the defendant is sentenced" unless such application violates the *Ex Post Facto* Clause. U.S.S.G. § 1B1.11 (2011). An *ex post facto* sentencing violation occurs when application of a later edition of the Guidelines would result in a higher base level. *See United States v. Rising Sun*, 522 F.3d 989, 993 n.1 (9th Cir. 2008). The *ex post facto* issue arises here because the sentences that the Defendants received under the 2007 Guidelines were longer than the sentences they likely would have received under earlier Guidelines. *Compare* U.S.S.G. § 2B1.1(a) (2007) (base offense level of either 6 or 7) *with* U.S.S.G. § 2B1.1(a) (2000) (base offense level of 4). The district court found that the charged conspiracy extended beyond November 1, 2001, and thus it applied the amended Guidelines with the higher base offense levels.

Defendants argue that the second superseding indictment alleged two separate groups of criminal activities—the Bank of China fraud and the immigration fraud—and that the date

of the last activity associated with the Bank of China fraud ended prior to the immigration fraud. Specifically, Defendants allege that any conspiracy to transport money associated with their bank fraud ended when Chaofan and Guojun crossed the border into the United States on October 15, 2001—before the November 1, 2001, effective date of the new Guidelines.

Defendants' arguments are unpersuasive because, contrary to Defendants' assertions, the second superseding indictment did not allege two separate conspiracies. Instead, it alleged a single RICO conspiracy with two purposes: the Bank of China fraud and immigration fraud. Defendants conspired to steal money from the Bank of China and then to travel to the United States with their ill-gotten gains. The charged conspiracy encompassed both the Defendants' fraud in China, including illegal money transactions and transportation of stolen money, and the Defendants' later immigration fraud to escape to the United States to flee Chinese law enforcement.

"Conspiracy is a continuing crime," *People of Territory of Guam v. Ignacio*, 852 F.2d 459, 461 (9th Cir. 1988), and a conspiracy does not automatically terminate because the government has defeated the conspiracy's objective, *see Jimenez Recio*, 537 U.S. at 274. Nevertheless, the duration of a conspiracy cannot be indefinitely extended "merely because the conspiracy is kept a secret, and merely because the conspirators take steps to bury their traces, in order to avoid detection and punishment." *Grunewald v. United States*, 353 U.S. 391, 397 (1957).

A conspiracy to conceal cannot be implied from circumstantial evidence supporting the existence of an

agreed-upon coverup after the central purpose of a conspiracy has been attained. *Id.* at 401–02. Courts should be wary of finding an "actual" as opposed to "implied" conspiracy to conceal based on "desperate attempts to cover up after the crime begins to come to light." *Id.* at 403. In this case, however, the Defendants' immigration fraud was not a desperate attempt to cover up the bank fraud; it was part of the bank fraud scheme. Defendants' elaborate immigration fraud scheme included false marriages involving all four Defendants who entered into the marriages before the bulk of the bank fraud even occurred. Those marriages were part of an overall plan to steal the money and get away with it in the United States. Recognizing the difference between "acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime," *id.* at 405, we conclude that, to the extent that the immigration fraud was an act of concealment, it was an integral part of the conspiracy's main criminal objective.

Furthermore, the conspiracy continued until October 2004. During their flight from Chinese authorities, Defendants traveled from California to Wichita, Kansas, in 2002. During these travels within the United States, Defendants carried with them and used the false identities and fraudulent immigration documents that were charged as part of the conspiracy. Guojun and Yingyi were arrested in Wichita on September 22, 2004. Documents related to Defendants' fraudulent marriages were found in the house where they were living. Chaofan and Wanfang were arrested in Edmond, Oklahoma, on October 6, 2004. A search of their residence resulted in the seizure of jewelry and cash totaling $154,000, stashed in various locations throughout the house.

Because Defendants continued their hiding and flight throughout the United States until October 2004—using fraudulently obtained immigration documents and carrying bundles of cash—the conspiracy continued until that date. Therefore, application of the amended Guidelines as reflected in the 2007 edition was appropriate.

Defendants argue that, even if the conspiracy did not end until Defendants' arrests, the 2004 Guidelines should have been consulted to determine whether they would be more favorable to Defendants. However, the Guidelines sections relevant to Defendants' RICO convictions (U.S.S.G. § 2S1.1 and § 2B1.1) are identical in the 2004 and 2007 editions. Thus, Defendants were not prejudiced by application of the 2007 Guidelines over the 2004 Guidelines.

Defendants' supplemental argument that application of pre-2001 Guidelines to unindicted co-conspirator Yu Zhendong should estop the government from applying later Guidelines to Defendants is devoid of supporting authority. Moreover, the district court considered Yu Zhendong's lesser sentence as a mitigating factor for Defendants.

In sum, the district court did not violate the *Ex Post Facto* Clause by applying the 2007 Guidelines to a conspiracy that did not end until Defendants' 2004 arrests.

### B.  Procedural Error

Defendants argue that the district court erred in applying Guidelines § 2S1.1(a)(1) instead of § 2S1.1(a)(2), resulting in a higher base offense level. We agree and remand for resentencing.

"We review the district court's interpretation of the Guidelines de novo, the district court's application of the Guidelines to the facts of the case for abuse of discretion, and the district court's factual findings for clear error." *United States v. Treadwell*, 593 F.3d 990, 999 (9th Cir. 2010). Incorrect calculation of the Guidelines range constitutes procedural error. *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc).

The district court determined that § 2S1.1(a)(1) applied to Defendants' count one RICO conspiracy conviction. Section 2S1.1(a)(1) instructs that Defendants' base offense level should be calculated by using the offense level for the underlying offense (here, the specified unlawful activity of "fraud, or a scheme to defraud, by or against a foreign bank") when two conditions are met. First, Defendants must have "committed the underlying offense" or would be accountable for the underlying offense under a relevant conduct analysis. U.S.S.G. § 2S1.1(a)(1)(A). Second, the offense level for that underlying offense must be able to be determined. U.S.S.G. § 2S.1.1(a)(1)(B).

Here, Defendants were convicted of conspiracy, an inchoate crime which does not require commission of the underlying offense. *See United States v. Thomas*, 887 F.2d 1341, 1345 (9th Cir. 1989). Defendants did not admit guilt on the substantive crimes enumerated in 18 U.S.C. §§ 1957 & 2314, and as discussed above, the government was unable to establish the tracing of funds necessary to establish guilt on those underlying offenses. Therefore, the government must rely on relevant conduct to meet § 2S.1.1(a)(1)(A)'s first condition. For the following reasons, we hold that applying the relevant conduct analysis to Defendants' foreign conduct is not permissible.

We have not addressed the applicability of foreign conduct to a base offense level calculation in analogous circumstances, but case law from other circuits that have confronted the issue makes us hesitant to apply the Defendants' foreign conduct to the base level calculation here. In *United States v. Farouil*, 124 F.3d 838 (7th Cir. 1997), the Seventh Circuit allowed consideration of drugs found on an overseas co-conspirator in the determination of a defendant's base offense level. The drugs were discovered in the co-conspirator's carry-on luggage as she was preparing to board a flight to the United States. *Id.* at 840, 845. The court determined that the drugs should be counted against the defendant because the drug crimes were directed against the United States. *Id.* at 845.

Here, Defendants were Chinese nationals who committed fraud against the Bank of China while on Chinese soil. The fraudulent proceeds were, of course, later laundered through Ever Joint and brought into the United States. However, the United States was only indirectly affected by Defendants' bank fraud. Put another way, the connection between Defendants' bank fraud and the United States is too attenuated to be considered when calculating a base offense level. By contrast, Defendants' immigration fraud directly impacted United States' interests, and thus it is properly considered domestic conduct that does not implicate the same relevant conduct concerns.

Similarly, in *United States v. Greer*, 285 F.3d 158 (2d Cir. 2002), drugs intended for foreign distribution were also included as relevant conduct in determining the base offense level because the underlying statute criminalized foreign conduct (*i.e.*, drug possession abroad) where the drugs were intended for distribution in the United States. 285 F.3d at

179–180 n.10.  In *Greer*, however, the district court had no
need to consider whether the defendant violated foreign law
to hold him responsible for his foreign acts because the
statute at issue specifically covered the extraterriorial
conduct.  *Id.* at 179–80.  But here, by instructing the jury that
Defendants' fraud against the Bank of China was a crime
under Chinese law, the district court placed the issue of
determining foreign law front and center.  Such
determinations are highly problematic for sentencing
purposes.

In *United States v. Azeem*, 946 F.2d 13 (2d Cir. 1991), the
Second Circuit warned that, "To permit foreign crimes to
figure in fixing the base offense level would require courts to
perform a careful comparative analysis of foreign and
domestic law in such instances."  946 F.2d at 17.  The issue
is more straightforward here because, as noted earlier, the
Defendants' acts during the bank fraud would have been a
crime under Chinese or American law.  Nevertheless, it is
easy to contemplate scenarios where a comparison of foreign
and domestic law is not so clear cut.  *See id.* at 18.
("Examples of activities that violate one, but not both, foreign
and domestic laws could be the use and sale of certain drugs
that would have violated our law, but not the foreign law
where sold and used, or a certain use of alcohol that violates
the foreign law where used but would not have done so under
domestic law.").  Therefore, we follow the Second Circuit
and "decline to create the complexities that the inclusion of
foreign crimes in the base offense level calculation would
generate."  *See Azeem*, 946 F.2d at 18.  Because Defendants'
foreign conduct cannot be used to meet the requirements of
§ 2S1.1(a)(1)(A), the district court procedurally erred in
applying that section to Defendants' sentences and we,

accordingly, remand for resentencing under § 2S1.1(a)(2) in light of this conclusion.

Defendant Chaofan also objects to various enhancements resulting in an increase to his base level. Chaofan's objection to a two-level enhancement for abuse of a position of trust under § 3B1.3 is meritless. *See* U.S.S.G. § 3B1.3 cmt. n.1 (providing "a bank executive's fraudulent loan scheme" as an example of abuse of trust). Chaofan's objection to a two-level enhancement for relocation to avoid law enforcement under § 2B1.1(b)(9)(A) is devoid of analysis and therefore waived. *See United States v. Belgarde*, 300 F.3d 1177, 1181 n.1 (9th Cir. 2002). However, Chaofan's objection to a one-level enhancement under § 2S1.1(b)(2)(A), for conviction under 18 U.S.C. § 1957, has merit because a finding of conviction under § 1957 for sentencing purposes depends on Chaofan's foreign conduct, which we have held cannot be applied here. Therefore, on remand the enhancement under § 2S1.1(b)(2)(A) cannot be applied.

We need not reach the issue of the substantive reasonableness of Defendants' sentences because we have determined that the district court erred procedurally. *United States v. Rudd*, 662 F.3d 1257, 1264 (9th Cir. 2011).

## C.  The $482 Million Restitution Order

Defendants allege that the district court did not adequately explain its conclusions in support of the $482 million restitution award. Specifically, Defendants argue that the district court never explicitly stated that restitution was mandatory, never explained how it determined that the Bank of China qualified as a victim, and never justified the $482 million award. We agree and remand for reconsideration.

"A restitution order is reviewed for an abuse of discretion, provided that it is within the bounds of the statutory framework. Factual findings supporting an order of restitution are reviewed for clear error. The legality of an order of restitution is reviewed de novo." *United States v. Marks*, 530 F.3d 799, 811 (9th Cir. 2008) (internal quotation marks omitted). The district court's valuation methodology is reviewed *de novo*. *United States v. Bussell*, 504 F.3d 956, 964 n.9 (9th Cir. 2007).

The district court engaged in a cursory analysis of the legal and factual basis for the restitution award before concluding that the evidence at trial supported a finding "by clear and convincing evidence that the loss to the Bank of China resulted from the underlying scheme to defraud in excess of $480 million." The $482 million restitution amount is for the most part consistent with the statement of offense conduct in the Presentence Report. However, Defendants contested those facts, and the district court rejected the presentence report's factual findings to the extent they were inconsistent with the district court's findings. Although we may uphold a restitution order when the district court fails to make pertinent factual findings, the basis of the court's calculations must be clear for us to do so. *United States v. Yeung*, 672 F.3d 594, 604 (9th Cir. 2012). The basis for the district court's calculations are not clear here.

"Restitution can only be based on actual loss." *United States v Stoddard*, 150 F.3d 1140, 1147 (9th Cir. 1998) (internal citations omitted). A restitution order must also be "based on losses directly resulting from a defendant's offense." *Bussell*, 504 F.3d at 964 (internal quotation marks omitted). We have previously noted the difficulties inherent in relying on loss determinations for purposes of Guidelines

calculations during the calculation of restitution amounts, *see United States v. Gossi*, 608 F.3d 574, 581–82 (9th Cir. 2010), and have held that such reliance is improper, *Yeung*, 672 F.3d at 604. The transcript of the sentencing hearing reveals that the district court referred to its Guidelines calculations in making factual findings regarding the amount of actual loss suffered by the Bank of China. This reference is especially inappropriate given the previously discussed inability to trace Defendants' fraudulent activity to actual bank losses. Therefore, because the district court did not provide sufficient grounds to support the $482 million figure, we remand for reconsideration regarding the legal and factual basis for the restitution order. *See United States v. Waknine*, 543 F.3d 546, 557–58 (9th Cir. 2008).

## IX. Conclusion

We affirm Defendants' convictions but vacate their sentences and remand for resentencing. Defendants' count one convictions are not the result of an improper extraterritorial application of the RICO conspiracy statute because Defendants' criminal enterprise involved both bank fraud and immigration fraud centered on stealing money from the Bank of China and traveling freely with that stolen money in the United States. The evidence was sufficient to support convictions on count two, money laundering conspiracy, and count three, conspiracy to transport stolen money.

We remand for resentencing because the district court improperly relied on Defendants' foreign conduct to meet the requirements of § 2S1.1(a)(1)(A) resulting in procedural

error, improperly applied a one-level enhancement based on foreign conduct, and failed to provide an adequate legal and factual basis for the $482 million restitution order.

**AFFIRMED, IN PART, VACATED, IN PART, AND REMANDED.**